*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 09a0425p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

IBRAHIM PARLAK,

        *Petitioner,*

    *v.*

ERIC H. HOLDER, JR.,

        *Respondent.*

No. 05-4488

Filed: November 24, 2009[*]

Before: MARTIN, GIBBONS, and SUTTON, Circuit Judges.

_____

## **ORDER**
_____

The court having received a petition for rehearing en banc, and the petition having been circulated not only to the original panel members but also to all other active judges of this court, and less than a majority of the judges having favored the suggestion, the petition for rehearing has been referred to the original panel.

The panel has further reviewed the petition for rehearing and concludes that the issues raised in the petition were fully considered upon the original submission and decision of the case. Accordingly, the petition is denied. Judge Martin would grant rehearing for the reasons stated in his dissent.

---

[*]This order was originally issued as an "unpublished order" filed on November 24, 2009. It is now designated for full-text publication and incorporates Judge Martin's dissent.

BOYCE F. MARTIN, JR., Circuit Judge, dissenting from denial of rehearing *en banc*. From 1994 until the government initiated deportation proceedings, Ibrahim Parlak operated a restaurant and raised his family in a small town in Michigan. There is no indication that he ever caused any problems here in the States. Why our government would elect to expend the time and money to rid our population of someone like Mr. Parlak is beyond me. As I acknowledged in my dissent to the panel opinion, however, "for the nation's immigrants, past may always be prologue," *Parlak v. Holder*, 578 F.3d 457, 471 (6th Cir. 2009) (Martin, J., dissenting), and, in any event, it is the government's prerogative to fritter away our resources as it sees fit. But one would assume that, if the government is going to expel a beneficial member of society for the alleged sins of his distant past, the government would go about its chosen folly correctly, in an above-board and dignified manner, and without over-reaching. One would further assume that those of us in the position of deciding Mr. Parlak's case, in the agency and in the judiciary, would demand this high standard of the government.

One would be wrong. In the hearing before the Immigration Judge, the government relied heavily upon evidence that no one genuinely disagrees was obtained by torture twenty-one years ago in a Turkish prison.[1] Then, in a heartwarming display of adjudicative neutrality, the Immigration Judge issued an opinion that did little more than cut and paste from the government's briefs, typographical errors and torture-induced admissions included. Adding insult to injury, the Immigration Judge demonstrated either unprecedented gumption or an unfortunate insensitivity to irony in determining that Mr. Parlak lacked credibility based on his demeanor on the stand while at the same time giving credence to evidence obtained by torture—it is worth mentioning again—in a

---

[1]Seriously, a Turkish prison.

Turkish prison.[2] Given this rather inauspicious start to Mr. Parlak's journey through our immigration system, one would assume that things would be righted at the next stop.

One would, again, be wrong. Having lost before the Immigration Judge, Mr. Parlak's next stop was the Board of Immigration Appeals. To its credit, the Board did not repeat the Immigration Judge's error with regard to the torture-induced evidence. Indeed, the Board's decision purports to disregard those portions of the Immigration Judge's opinion that rely on this evidence, though I have my doubts about the Board's ability to do this in practice. But, while it tried to repair the damage caused by the Immigration Judge, the Board caused even more harm on its way to affirming the judgment of the Immigration Judge.

A major issue before the Board was whether Mr. Parlak was eligible for withholding from removal—meaning that he could not be deported—or whether he was ineligible for withholding—meaning that he could be deported—due to the so-called "persecutor bar." The "persecutor bar" renders an immigrant deportable if, in the past, the immigrant "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U.S.C. §§ 1101(a)(42)(B), 1158(b)(2)(A)(i), 1231(b)(3)(B)(i). Both the plain language of the statute and settled precedent from the circuits recognize that operation of the "persecutor bar" requires a direct nexus between the immigrant's actions and the persecution of another as well as an intent to persecute or knowledge that persecution was occurring. *E.g. Diaz-Zanatta v. Holder*, 558 F.3d 450, 455 (6th Cir. 2009) (citing *Singh v. Gonzales*, 417 F.3d 736, 739 (7th Cir. 2005), and *Castaneda-Castillo v. Gonzales*, 488 F.3d 17, 20 (1st Cir. 2007)); *Balachova v.*

---

[2]For a more detailed description of the two-ring (one for the Immigration Judge and one for the government) circus that occurred in the first round of removal proceedings, see Judge Cohn's excellent opinion in *Parlak v. Baker*, 374 F. Supp. 2d 551 (E.D. Mich. 2005). In that case, Mr. Parlak sought habeas relief from his detention pending the completion of removal proceedings. Judge Cohn aptly describes the government's "piling on of removability charges" against Mr. Parlak. He further recounts how the Immigration Judge ordered that Mr. Parlak be detained on suspicions that he engaged in terrorist activity even though he had not been accused of engaging in any terrorist activity. I agree with Judge Cohn's observation that "once Petitioner was labeled a terrorist, the proceedings took on a decidedly more complex, if not high-profile, aura." *Id.* at 560. I take some solace in the fact that at least Judge Cohn did something right by Mr. Parlak when he ordered that Mr. Parlak be released during the pendency of his removal proceedings.

*Mukasey*, 547 F.3d 374, 384 (2d Cir. 2008). However, instead of employing this relatively uncomplicated inquiry to determine whether the evidence against Mr. Parlak triggered the "persecutor bar," the Board employed its own misguided inquiry to determine whether Mr. Parlak's actions of long ago "further[ed] persecution in some way." Finding that Mr. Parlak's actions did, indeed, further persecution in some way, the Board found that he was ineligible for withholding from removal. My colleagues on the panel describe this inquiry as "vague and unhelpful." *Parlak*, 578 F.3d at 469. I would describe it as grossly over-inclusive and as having sprung, unwanted and uncontrollable, from the collective mind of the Board like Athena from the head of Zeus, except without Athena's wisdom and elegance. But semantics aside, we all agree that the Board's inquiry was incorrect. One would assume that, in the face of a fundamentally flawed proceeding in front of the Immigration Judge and an incorrect analysis by the Board, the next body to examine this case would send Mr. Parlak's case back to start afresh.

One would, for a third time, be wrong. Mr. Parlak appealed the Board's decision to our Court. I believe that my colleagues on the panel recognized that the case came before us suffering from numerous procedural infirmities, and the majority's opinion shows that they tried mightily to inject some semblance of reason into the decisions of the Immigration Judge and the Board. Although I applaud their effort, I disagree with many of their legal conclusions. I set forth my disagreement in detail in my dissent to the panel opinion, *Parlak*, 578 F.3d at 471-81, so I do not reproduce it here.

But my larger question, and the first of two main reasons I believe this case should have been reheard *en banc*, is why the majority felt compelled to undertake this effort at all. The Board indisputably used the wrong standard in analyzing Parlak's case. In this situation, the Supreme Court instructs us to remand the case so that it may be analyzed in the first instance under the correct law. *Negusie v. Holder*, __ U.S. __, 129 S. Ct. 1159, 1167 (2009). And, before this case, it was the settled practice of our Court to remand when the Board or Immigration Judge apply the incorrect law. *See, e.g.*, *Callin v. Holder*, 333 F. App'x 926, 927 (6th Cir. 2009) ("Because we conclude that the

BIA applied the wrong legal standard in reviewing Callin's claim that she did not receive the notice of removal proceedings, we reverse and remand to the BIA for review of this claim under the applicable statute, and to allow Callin's presentation of evidence."); *Tran v. Gonzales*, 447 F.3d 937, 944 (6th Cir. 2006).

Remanding in situations such as this serves two basic functions, one practical and one pedagogical. Practically, we remand because our question on review is whether "substantial evidence" supports the Immigration Judge's or the Board's legal conclusions as to deportation. How can we tell if substantial evidence supports another adjudicator's legal conclusions if the adjudicator employed the wrong legal analysis? Pedagogically, we remand to remind all involved that the proceedings in front of the Immigration Judge and the Board are not mere formalities on the way to an ultimate decision by the courts of appeals, but instead must be carried out in accordance with the law. Instead of remanding, however, the majority undertook what should have been the work of the Immigration Judge and the Board on remand by conducting a de facto *de novo* review of Mr. Parlak's claims. This undertaking directly contradicts instructions from the Supreme Court, as well as the binding precedent and common practice of this Court. Thus, this case should have been reviewed *en banc*.

This leads into the second reason that I believe the *en banc* Court should have taken this case. As it stands, the majority's attempt to clear away the problems caused by the Immigration Judge and the Board is likely the final word on Mr. Parlak's removal. But the majority's opinion did not fix the problems; it compounded them. On behalf of our Court, the opinion offers a tip of the hat to the highly questionable result without so much as a wag of the finger[3] at the unquestionably flawed process, leaving me to wonder why we even maintain the pretense of procedure.

As I stated a few years ago, our recent immigration practice has effectively changed Emma Lazarus's beautiful words at the base of the Statue of Liberty from a solicitation seeking the tired, poor, huddled masses of the world into the exhortation

---

[3]With a tip of the hat to M. Colbert of *The Colbert Report*.

"don't let the door hit you on the way out." *N'Diom v. Gonzales*, 442 F.3d 494, 500 (6th Cir. 2006) (Martin, J., concurring).  If this is what the law dictates, then we judges may not stand in the way.  But our Court would have done well to convene to let it be known that, though we will not interfere with the deliberative execution of the immigration laws, we will not be accomplices in the government's unprincipled slamming of doors on those "tempest-tost" who, like Mr. Parlak, seek nothing more than to "breathe free." *Id.* (reproducing Lazarus's *The New Colossus*).

I respectfully dissent from the denial of rehearing *en banc*.

ENTERED BY ORDER OF THE COURT

/s/ Leonard Green

_____

Clerk